IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERBERT SCHMINKEY, | : | Civil Action No. 4:14-CV-01945 |
| | : | |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| MARK ADAMS, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**
August 8, 2016

Pending before this Court is a motion for summary judgment filed by

Defendant Mark Adams (hereinafter "Trooper Adams") against Plaintiff Herbert

Schminkey (hereinafter "Mr. Schminkey"). The motion seeks to dismiss Mr.

Schminkey's complaint in its entirety, which now consists of one count of

unreasonable/false arrest and one count of false imprisonment, both pursuant to 42

U.S.C. § 1983.[1] The matter has been fully briefed and is now ripe for disposition.

In accordance with the following reasoning, Trooper Adams' motion for summary

judgment is denied.

---

[1] ECF No. 1. Mr. Schminkey's complaint lists the following counts: Count I: Unreasonable Arrest, 18 U.S.C. § 1983; Count II: False Imprisonment, 18 U.S.C. § 1983; Count III: Malicious Prosecution, 42 U.S.C. § 1983; Count IV: False Arrest/False Imprisonment (state law); Count V: Intentional Infliction of Emotional Distress (state law); Count VI: Defamation (state law); Count VII: Malicious Prosecution (state law). Mr. Schminkey voluntarily dismissed Counts IV and VII (ECF No. 9) and subsequently Counts III, V, and VI (ECF No. 22).

## I. BACKGROUND

Mr. Schminkey's complaint arises from an incident resulting in his arrest. On June 24, 2014, Mr. Schminkey reported to the Stonington State Police Barracks, Northumberland County, Pennsylvania, in order to be fingerprinted in connection with a prior DUI arrest. Upon arrival, he presented his driver's license to the officer at the front desk, later identified as Officer Clayton Hubler, who instructed him to have a seat in the lobby. While he waited, Officer Hubler ran Mr. Schminkey's license and informed Trooper Adams, who had been asked to fingerprint Mr. Schminkey, that his license had come up associated with an individual named "Stanley Lesnefsky," a fugitive wanted in New Jersey.

Trooper Adams then escorted Mr. Schminkey into the fingerprint room and, after several failed attempts, obtained Mr. Schminkey's fingerprints. Mr. Schminkey was then told to wait in the room for his fingerprints to be processed. While he waited, Corporal Gerald Hughes entered the room and began asking Mr. Schminkey questions about Stanley Lesnefsky.

Forty-five minutes later, after Mr. Schminkey's fingerprints had been processed, Trooper Adams placed Mr. Schminkey under arrest and prepared a criminal complaint, charging him as the fugitive Stanley Lesnefsky. Mr. Schminkey was shackled to the floor of the patrol room and remained shackled for four hours until he was arraigned by a magisterial district judge and then,

curiously, released on his own recognizance. Throughout this time, Mr. Schminkey repeatedly maintained that he was not Stanley Lesnefsky.

Three weeks later, on July 14, 2016, after making a request through the Pennsylvania Criminal Intelligence Center, Trooper Adams received a report which included a license photograph for Stanley Lesnefsky. The photograph revealed that Mr. Schminkey was clearly not Stanley Lesnefsky, prompting Trooper Adams to withdraw the charges against Mr. Schminkey the following day.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] A fact is "material" where it "might affect the outcome of the suit under the governing law."[3]  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party."[4]

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.[5] The moving party may satisfy this burden by either (i) submitting affirmative evidence that negates an essential element of

---

[2] Fed. R. Civ. P. 56(a).
[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[4] *Id.*
[5] *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).

the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.[6]

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[7] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[8]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[9] Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's

---

[6] *Id.* at 331.
[7] *Anderson*, 477 U.S. at 250.
[8] Fed. R. Civ. P. 56(c)(1); *see also Anderson*, 477 U.S. at 248–50.
[9] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).

assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[10]

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.[11] Credibility determinations are the province of the factfinder, not the district court.[12] Although the Court may consider any materials in the record, it need only consider those materials cited.[13]

## III. DISCUSSION

As stated above, Trooper Adams seeks to dismiss Mr. Schminkey's remaining counts of unreasonable/false arrest and false imprisonment under 42 U.S.C. § 1983. To succeed on a count of false arrest under 42 U.S.C. § 1983, the proper inquiry is whether the arresting officers had probable cause to believe the person arrested committed an offense, regardless of whether that person actually committed the offense.[14] Furthermore, when an arrest is based upon a valid warrant, there is no automatic Fourth Amendment violation even if the wrong person in arrested.[15] Similarly, a "false imprisonment claim under § 1983 . . . is

---

[10] Fed. R. Civ. P. 56(e)(2).
[11] *Anderson*, 477 U.S. at 249.
[12] *BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).
[13] Fed. R. Civ. P. 56(c)(3).
[14] *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988).
[15] *Hill v. California*, 401 U.S. 797, 802 (1971).

based on an arrest made without probable cause."[16] Hence, the determining factor in both counts hinges on whether the arresting officer had probable cause to arrest the plaintiff, regardless of whether the arrest turned out to be erroneous.

The United States Supreme Court has held that probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been committed.[17] In considering whether probable cause exists, courts must look to "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[18] In other words, courts must apply "[a] 'common sense' approach . . . and a determination as to [the existence of probable cause] must be based on 'the totality of the circumstances.'"[19]

Trooper Adams contends that even though the arrest of Mr. Schminkey was in error, he nevertheless had probable cause to arrest him. Trooper Adams points to two "facts" which, he argues, were adequate, without more, to establish probable cause: first, that Mr. Schminkey's driver's license came back associated with

---

[16] *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (*citing Barna v. City of Perth Amboy,* 42 F.3d 809, 820 (3d Cir.1994)).

[17] *Draper v. U.S.*, 358 U.S. 307, 333 (1959) (*citing Carroll v. U.S.*, 267 U.S. 132 (1925)).

[18] *Id.*

[19] *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (*citing Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir. 1997)).

Stanley Lesnefsky, and second, that his fingerprints came back as belonging to

Stanley Lesnefsky.

Mr. Schminkey does not dispute the contention that the name Stanley

Lesnefsky came up "associated" with his license when it was initially run after his

arrival at the police barracks on June 24, 2014.[20] He strongly disputes, however,

that his fingerprints came back as belonging to Stanley Lesnefsky. Mr. Schminkey

also argues that Trooper Adams had knowledge of both Mr. Schminkey's and

Stanley Lesnefsky's physical attributes and, therefore, should have known that

they were in fact different people.

## A. Whether Mr. Schminkey's fingerprints came back as belonging to Stanley Lesnefsky is a question of material fact for the jury.

It is undisputed that, after Mr. Schminkey's driver's license had been run, he

was taken to another room to be fingerprinted and told to wait until the results of

the fingerprints were processed. Approximately forty-five minutes later, the results

were received and Mr. Schminkey was then arrested as Stanley Lesnefsky.

---

[20] After a throughout review of the documents provided to this Court for consideration of this motion for summary judgment, this Court is still unclear as to the significance of this initial "hit confirmation." In his deposition and in the brief supporting his motion to dismiss, Trooper Adams indicates that, after Mr. Schminkey's license was run, the results indicated that his name was "associated" with the name Stanley Lefnseky. *See* ECF No. 27-2, Deposition of Trooper Mark Adams, at 12 ("I was told prior to printing Mr. Schminkey that he had come up associated with this other name, Stanley Lesnefsky, when they ran his driver's license.") On the other hand, in his deposition, Corporal Gerald Hughes seemed to indicate that after Mr. Schminkey's license was run, it indicated that he was "wanted." When asked who the individual was who was wanted in New Jersey, he indicated "Stanley Lesnefsky with an alias of Herbert Schminkey and alias date of birth of Mr. Schminkey's and an alias soc of Mr. Schminkey's." ECF No. 27-3 at 19. The parties produced what has been referred to as the "hit confirmation," a one-page form that has almost no information. ECF No. 25-5. The form states "HIT CONFIRMATION RESONSE. . . THE RECORD BELOW IS CONFIRMED . . . ***WANTED PERSON*** NAM/LESNEFSKY, STRANLEY, DOB/19591115.SEX/M." However, as the parties both indicated that Mr. Schminkey's name came up "associated" with Stanley Lesnefsky, this Court will adopt this language.

According to Trooper Adams, Corporal Hughes first viewed the results and then passed them on to Trooper Adams. The results consisted of a Pennsylvania rap sheet for Herbert Schminkey and an "additional sheet" that listed names for Stanley Lesnefsky and included the name "Herbert Schminkey" as an alias.[21] All of the officers present reviewed the paperwork and agreed that Mr. Schminkey appeared to be Stanley Lesnefsky.

Mr. Schminkey submits copies of both of these documents, the Pennsylvania rap sheet for Herbert Schminkey[22] and the "additional sheet" referred to by Trooper Adams as part of his deposition.[23] Trooper Adams further cites to ECF No. 27-3, at page 173 (also identified as Exhibit H-11) as the form that he saw in addition to Herbert Schminkey's rap sheet. This document, upon close examination by this Court, however, does not support Trooper Adams' claim that he viewed this document prior to arresting Mr. Schminkey.

First, Mr. Schminkey's Pennsylvania rap sheet states that it is the "RESPONSE TO FINGERPRINT SUBMISSION PAPS5900 MILTON STATE POLICE TCN: 1371400138."[24] The date is clearly stated as "20140624," or June

---

[21] Q: And then what did you do once you had this - - - when you were handed this rap sheet by Corporal Hughes? A: I looked at it. Following the Pennsylvania rap sheet, there was an additional sheet that said Stanley Lesnefsky and then Herbert Schminkey at the bottom of all those names. Q: So there was a PA rap sheet? A: There's a PA rap sheet generated. Then an additional sheet generated which identified Lesnefsky and Schminkey as a match . . . Q: And the PA rap sheet, who is that on? A: That was on Herbert Schminkey, Jr. Q. And then I believe you had indicated that the additional sheet was where the first reference to Stanley Lesnefsky was? A: Correct." ECF No. 27-2 at 24-25.
[22] ECF No. 27-4.
[23] ECF No. 21-3 at 173.
[24] ECF No. 27-4.

24, 2014, the date of Mr. Schminkey's arrest.[25] There is no mention of the name

Stanley Lesnefsky anywhere on the Pennsylvania rap sheet.

Conversely, the "additional sheet" states that "THIS IS THE RESULT OF

FINGERPRINT SUBMISSION FOR TCN: 1371400142."[26] It further states the

number "PAPSP7800" and indicates the date as "20140701," or July 1, 2014.[27]

While the parties do not describe the significance of the numbers, this Court would

assume that if the document had been generated from the same fingerprint

submission yielding the Pennsylvania rap sheet, the fingerprint submission

numbers would match. Even if this is not the case, this document was clearly

retrieved on July 1, 2014, six days after Mr. Schminkey was arrested and released

on his own recognizance. This is not to say that the "additional sheet" Trooper

Adams refers to in his deposition does not exist; it is apparent, however, that the

Court cannot rely on this particular document, Exhibit 11-H, as evidence that Mr.

Schminkey's fingerprints came back as Stanley Lesnefsky at the time of Mr.

Schminkey's arrest.[28]

---

[25] *Id.*
[26] ECF No. 21-3 at 173.
[27] *Id.*
[28] The following reference is made:
      AKA/LASNEFSKY, STANLEY
      AKA/LASNEFSKY, STANLEY JOSEPH
      AKA/LESNEFSKI, STANLEY K
      AKA/LESNEFSKY, STAN
      AKA/LESNEFSKY, STAN J
      AKA/LESNEFSKY, STANLEY
      AKA/LESNEFSKY, STANLEY JOSPEH (*sic*)
      AKA/SCHMINKEY, HERBERT

**B. Whether Trooper Adams should have known that Mr. Schminkey and Mr. Lesnefsky were different people is a question of material fact for the jury.**

It is undisputed that, at the time of the arrest, Trooper Adams had the following information available to him: the information on Mr. Schminkey's driver's license, the "hit confirmation" generated after running the license and revealing that Mr. Schminkey was "associated" with Stanley Lesnefsky, the information on Mr. Schminkey's Pennsylvania rap sheet which was provided in response to the fingerprint request, and a physical description of Stanley Lesnefsky from a thirty-year-old arrest.

In light of these documents, Trooper Adams knew that Mr. Schminkey was 5'11'' tall, weighed 210 pounds, had gray hair, had brown or hazel eyes, and had tattoos on both of his upper arms, his left forearm, and his back. According to his deposition, Trooper Adams was also aware that Stanley Lesnefsky was born on November 15, 1959, was 5'7'' tall, weighed 130 pounds, had brown hair and eyes, and had unspecified tattoos on at least one arm. Accordingly, the Court must determine if this information, in conjunction with the "hit confirmation," was enough to establish probable cause for the arrest of Mr. Schminkey.

In essence, this is a case of mistaken identity. In considering whether an arrest was reasonable, albeit mistaken, "the test appears to be whether defendants knew or should have known of the mistaken identity or 'acted with something akin to deliberate indifference' as to whether plaintiff was the person named in the

indictment."[29] As the United States District Court for the Southern District of Ohio

explains:

> There are circumstances where it would be clearly unreasonable not to investigate a claim [of] mistaken identity. For example, if the person arrested did not match the physical description of the defendant on the warrant or readily available to the arresting officers because of a large difference in height, weight, racial characteristics, tattoos or the like, it would be unreasonable for the officers to arrest him without further investigation.[30]

For example, in *Brinson v. Syas*,[31] plaintiff Kendale Brinson was pulled over

for a routine traffic violation. After running a name check on the computer inside

the police vehicle, officers were notified that a warrant existed for an individual

named "Jerry Talley." The warrant listed Jerry Talley, born in May 1963, as being

5'9'' tall, 160 pounds. Kendale Brinson, on the other hand, was born in 1966, was

6'5'' and weighed 198 pounds. Mr. Brinson was nevertheless arrested pursuant to

the warrant. The court determined that there was a question of material fact as to

whether the arrest was reasonable:

> Here, the Officers encountered an individual with the same name as an alias listed in a warrant for another individual. Both individuals were African–American males and were roughly the same age. The crucial discrepancy, however, is the substantial physical difference between the two. Brinson was a full eight inches taller than Jerry Talley and weighed over forty pounds more. As the Seventh Circuit observed in [*Maxwell v. City of Indianapolis*], "[w]hile weight is a

---

[29] *Morales v. Franklin Co. Sheriffs*, 2014 WL 1576916 (S.D. Ohio April 17, 2014) (*citing Gant v. Co. of Los Angeles*, 765 F.Supp.2d 1238, 1248 (C.D. Ca. 2011), *Gray v. Cuyahoga Co. Sheriff's Dept.*, 150 F.3d 579, 583 (6th Cir. 1998)).
[30] *Morales*, 2014 WL 1576916 at *4 (*citing Maxwell v. City of Indianapolis,* 998 F.2d 431, 434–35 (7th Cir.1993)).
[31] 735 F. Supp. 2d 844 (N.D. Ill. 2010).

11

mutable characteristic, the size of the difference here should have given the police officers pause." [998 F.2d 431, 435 (7th Cir. 1993)] (affirming the denial of summary judgment where the person arrested was six inches taller than the suspect). This case presents more than a trivial difference between a birth date or a name; it presents a significant difference between an unusually large individual and a fairly average one. . .

Moreover, it is noteworthy that Brinson did not have the same name as the person listed in the warrant, as the Officers suggest. Brinson's name was merely one of Jerry Talley's aliases; it was not the primary name . . . This testimony, coupled with the significant physical discrepancies, the name of the alias and the Officers' failure to investigate further, is enough to undermine the reasonableness of the Officers' decision to arrest Brinson. This is not to say conclusively that the Officers acted unreasonably. The Court merely finds that Brinson has put forth enough evidence to create a triable issue as to the reasonableness of the Officers' decision to make an arrest.[32]

Similarly, in *Grant v. County of Los Angeles*,[33] plaintiff Jose Ventura was pulled over for a traffic violation, during which a warrant check revealed an outstanding warrant for a "Jose Ventura" bearing not only the plaintiff's name but also his date of birth.[34] The court nevertheless held that a triable issue of fact as to the reasonableness of the arrest existed because, while the warrant described the individual as 6'1'' tall and 200 pounds, the plaintiff was 5'6'' and weighed 320 pounds.[35]

---

[32] *Id.* at 853.
[33] *Grant v. County of Los Angeles*, 765 F. Supp. 2d 1238, 1250-51 (C.D. Ca. 2011) (reversed in part on other grounds).
[34] *Id.*
[35] *Id.*

On the other hand, some courts have granted summary judgement in cases of mistaken identity. In these cases, however, the discrepancies were less drastic than in *Brinson* and *Grant*. In *Martinez v. City of New York*,[36] the United States Court of Appeals for the Second Circuit granted summary judgment when the plaintiff had the same name and birthdate as the wanted individual and only had a height and weight discrepancy of two inches and twenty pounds. Likewise in *Brass v. County of Los Angeles*,[37] the plaintiff and the wanted individual were "the same race and coloring, were within three years of the same age, and were within one inch in height and twenty pounds in weight." Even here, however, the court held that "physical similarities alone . . . are not enough to establish probable cause"[38] and summary judgment was only granted because of the fact that plaintiff and the wanted individual used the same residential address, in conjunction with the physical similarities between the two.

In *Rodriguez v. Farrell*,[39] the plaintiff shared the identical name, sex, race, and age of the wanted person and additionally had similar birth dates, social security numbers, addresses, birth places, and tattoos.[40] The Eleventh Circuit distinguished this case from other cases of mistaken identity (including the case at

---

[36] 340 Fed. Appx. 700 (2d Cir. 2009).
[37] 10 Fed. Appx. 412, 415 (9th Cir. 2001).
[38] *Id.*
[39] 280 F.3d 1341 (11th Cir. 2002).
[40] *Id.* at 1350.

hand) in that *Rodriguez* involved an "on-the-spot" decision to arrest the plaintiff by an officer in the field.[41]

Having considered these well-reasoned opinions, both granting and denying summary judgment in this area, this Court finds that the issue of whether the arrest of Mr. Schminkey was reasonable is one for the jury. While Mr. Schminkey and Stanley Lesnefsky share the same race, similar birthdates, and each have a tattoo on at least one of their arms, there is a height difference of at least four inches and a weight difference of eighty pounds.[42] Furthermore, Mr. Schminkey has lived in Northumberland County, Pennsylvania for over thirty years. He even told the officers that he lived next door to a state trooper also stationed at the Stonington Barracks and that another trooper played with his son growing up. While he did inform the officers that he lived in New Jersey for a short time when he was very young, he made it clear that he lived in South Plainfield, not Camden, where Stanley Lesnefsky's warrant stems from, and that relocated from the Garden State when he was only five years old.

---

[41] *Id.* ("no precedent had decided that the nighttime arrest, in conjunction with a traffic stop, of a person—who had been riding in an automobile in which unlawful drugs were being carried, and who was admittedly within five inches of the height of a fugitive for which a valid warrant for arrest (for offenses including a drug offense) was in existence and known to the arresting officers—violated the Federal Constitution when the arrested person shared with the fugitive (1) similar birth dates, social security numbers, addresses, birth places and tattoos as well as (2) the identical name, sex, race and age.")

[42] Mr. Schminkey also argues that he has hazel eyes and grey hair while Stanley Lesnefsky was reported as having brown eyes and brown hair. These differences can, however, be attributed to age or lighting and fail to add much support for this argument.

14

Moreover, despite having all of this information available at the time of the arrest, deposition testimony suggests that this case may be one in which the wish was the father to the thought. Both Trooper Adams and Corporal Hughes testified that Trooper Adams began compiling the criminal charges against Mr. Schminkey "in anticipation for a match" before the fingerprint results were even received.[43] Both Trooper Adams and Corporal Hughes also indicated that Mr. Schminkey was escorted from the fingerprint room to the patrol room before the fingerprint response came back.[44] In the patrol room, Mr. Schminkey was "detained" by a leg shackle. While neither Trooper Adams nor Corporal Hughes could recall who shackled Mr. Schminkey, the testimony seems to indicate that he was likely shackled before the receipt of the fingerprint results.[45] The evidence here suggests that the officers thought that Mr. Schminkey was Stanley Lesnefsky, despite the evidence to the contrary. Whether this thought was reasonable is for the jury to decide.

---

[43] ECF No. 27-2, Deposition of Trooper Mark Adams, at 26 ("Q: And what did you do in response to looking over this report and evaluating it? A: I was already starting the criminal complaints in anticipation for a match . . ."); *see also* ECF 27-3, Deposition of Corporal Hughes at 41 ("Trooper Adams is the one who typed up the charges. He typed up the charges at my request while we were waiting for the fingerprints to come back, I believe. But if it came back not to be him, we would have just, you know, torn them up, throw them away, thrown them away and send him on his way.").

[44] ECF No. 27-2 at 29 ("Q: How long he (sic) been there at the time that he was moved by Corporal Hughes? A: He came in after he was fingerprinted but before the fingerprint response came back."); ECF No. 27-3 at 35.

[45] ECF No. 27-2 at 29; ECF No. 27-3 at 35-6 ("he would have been escorted into the patrol room. We do not have a holding cell just for liability purposes, so we have a bench in our patrol room. So he would have been placed on the bench and detained there. . . Q: Do you recall how long Mr. Schminkey was at the patrol room bench until you got your fingerprint results back? A: I do not recall, no.")

**IV. CONCLUSION**

Consequently, and in accordance with the foregoing reasoning, Defendant's motion for summary judgment is denied.

An appropriate Order follows.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge